ORAL ARGUMENT NOT YET SCHEDULED

**CASE NO. 25-7033**

**UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

GLOBAL VOICE GROUP SA,
*Appellant*

v.

REPUBLIC OF GUINEA,
*Appellee*

On Appeal from the United States District Court for the District of Columbia
No. 1:22-cv-2100-JMC

**APPELLANT'S OPENING BRIEF**

Dennis H. Hranitzky
QUINN EMANUEL URQUHART
    & SULLIVAN, LLP
2755 East Cottonwood Parkway
Suite 430
Salt Lake City, UT 84121
(801) 515-7300
dennishranitzky@quinnemanuel.com

Alex H. Loomis
QUINN EMANUEL URQUHART
    & SULLIVAN, LLP
111 Huntington Avenue, Suite 520
Boston, MA 02199
(617) 712-7100
alexloomis@quinnemanuel.com

Owen B. Smitherman
QUINN EMANUEL URQUHART
    & SULLIVAN, LLP
300 W. 6th Street, Suite 2010
Austin, TX 78701
(737) 667-6100
owensmitherman@quinnemanuel.com

June 17, 2025

*Counsel for Appellant,
Global Voice Group SA*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

The parties before this Court are Appellant Global Voice Group SA, a company organized under the laws of the Seychelles, and Appellee the Republic of Guinea, a foreign state. There are no intervenors or *amici* to date.

This is an appeal from the Order and Memorandum Opinion entered by Judge Jia M. Cobb on February 18, 2025 (ECF.Nos. 43 & 44) granting Defendant Republic of Guinea's motion to dismiss and denying Plaintiff Global Voice Group SA's motions for default judgment or summary judgment. These decisions have not been published, but the Memorandum Opinion is available at 2025 WL 522048.

This case has not previously been before this Court or any other court. The following pending cases pose related issues to those presented in this appeal:

1. *Hulley Enters. Ltd. v. Russian Fed'n*, No. 23-7174 (D.C. Cir.);

2. *Amaplat Mauritius Ltd. v. Zimbabwe Mining Dev. Corp.*, No. 24-7030 (D.C. Cir.); and

3. *TIG Ins. Co. v. Republic of Argentina*, No. 18-mc-129 (D.D.C.).

# RULE 26.1 DISCLOSURE STATEMENT

Global Voice Group SA, a company organized under the laws of the Seychelles, has no parent company, and no publicly held company has a 10% or greater ownership interest in it.

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES................i

RULE 26.1 DISCLOSURE STATEMENT ............................................... ii

TABLE OF AUTHORITIES....................................................................v

GLOSSARY ........................................................................................xi

STATEMENT WITH RESPECT TO ORAL ARGUMENT................... xii

PRELIMINARY STATEMENT..............................................................1

JURISDICTIONAL STATEMENT .......................................................4

STATEMENT OF ISSUES ....................................................................5

BACKGROUND ..................................................................................5

    A.    The Partnership Agreement ...................................................5

    B.    The Amendment And Addendum..........................................7

    C.    The ICC Arbitration..............................................................9

    D.    The French Court Proceedings............................................12

    E.    Proceedings Below ..............................................................13

SUMMARY OF ARGUMENT..............................................................17

STANDARD OF REVIEW ..................................................................19

ARGUMENT ......................................................................................19

I.    The District Court Had Subject-Matter Jurisdiction Under The FSIA's Arbitration Exception ........................................................20

    A.    The Paris Court Of Appeal Conclusively Found That Guinea Was Bound By The Agreement.................................22

        1.    The District Court Failed To Apply *TIG*...................25

        2.    The District Court Failed To Apply Issue Preclusion And Fed. R. Civ. P. 10........................................................26

        3.    The District Court Failed To Apply The Law Governing Conflict-Of-Laws And New York Convention .........................27

    B.    The Tribunal Conclusively Found That Guinea Was Bound By The Agreement ..................................................35

|  | 1. | Guinea Clearly And Unmistakably Delegated Arbitrability To The Tribunal | 36 |
|---|---|---|---|
|  | 2. | The Tribunal's Arbitrability Ruling Is Conclusive | 41 |
| C. | | Even If Neither Decision Is Conclusive, The Arbitration Agreement Was Still "Made By" Guinea | 43 |
|  | 1. | Guinea Was A Party To The Arbitration Agreement | 44 |
|  | 2. | Even If It Is Not A "Party" To The Arbitration Agreement, Guinea Still "Made" The Arbitration Agreement | 50 |
| II. | | The District Court Had Subject-Matter Jurisdiction Under The FSIA's Waiver Exception | 52 |

CONCLUSION ...........................................................................................56

CERTIFICATE OF COMPLIANCE ......................................................58

ADDENDUM ...........................................................................................59

ADDENDUM TABLE OF CONTENTS...................................................i

CERTIFICATE OF SERVICE ...............................................................63

**Page**

<u>Cases</u>

*Amaplat Mauritius Ltd. v. Zimbabwe Mining Dev. Corp.*,
   663 F. Supp. 3d 11 (D.D.C. 2023)....................................................53

*Arthur Andersen LLP v. Carlisle*,
   556 U.S. 624 (2009)........................................................................22

*Balkan Energy Ltd. v. Republic of Ghana*,
   302 F. Supp. 3d 144 (D.D.C. 2018)................................................29

*Beijing Shougang Mining Inv. Co. v. Mongolia*,
   11 F.4th 144 (2d Cir. 2021) ...........................................................38

*Belize Social Dev. Ltd. v. Gov't of Belize*,
   794 F.3d 99 (D.C. Cir. 2015).................................18, 19, 28, 45, 46

*Bodum USA, Inc. v. La Cafetiere, Inc.*,
   621 F.3d 624 (7th Cir. 2010) ..........................................................25

*Brittania-U Nigeria, Ltd. v. Chevron USA, Inc.*,
   866 F.3d 709 (5th Cir. 2017) ..........................................................37

*Campaign Legal Ctr. v. 45Committee, Inc.*,
   118 F.4th 378 (D.C. Cir. 2024).......................................................27

*Cargill Int'l S.A. v. M/T Pavel Dybenko*,
   991 F.2d 1012 (2d Cir. 1993) .........................................................28

*CBF Indústria de Gusa S/A v. AMCI Holdings, Inc.*,
   850 F.3d 58 (2d Cir. 2017) .............................................................31

*CBS Corp. v. WAK Orient Power & Light Ltd.*,
   168 F. Supp. 2d 403 (E.D. Pa. 2001)..............................................39

*Centex Corp. v. United States*,
   52 Fed. Cl. 599 (Fed. Cl. 2002) ......................................................47

*Chevron Corp. v. Ecuador*,
   795 F.3d 200 (D.C. Cir. 2015)...................................................21, 44

*Commc'ns Workers of Am. v. AT&T Inc.*,
6 F.4th 1344 (D.C. Cir. 2021)................................................37

*Compañía de Inversiones Mercantiles S.A. v. Grupo Cementos de Chihuahua S.A.B. de C.V.*,
58 F.4th 429 (10th Cir. 2023) ...............................................31

*Corporación AIC, SA v. Hidroeléctrica Santa Rita S.A.*,
66 F.4th 876 (11th Cir. 2023) ...............................................32

*Creighton Ltd. v. Government of State of Qatar*,
181 F.3d 118 (D.C. Cir. 1999)................................................52

*Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*,
932 F.3d 126 (3d Cir. 2019) .................................................54

*Durfee v. Duke*,
375 U.S. 106 (1963)...........................................................43

*EEOC v. St. Francis Xavier Parochial Sch.*,
117 F.3d 621 (D.C. Cir. 1997) ...............................................26

*Esso Expl. & Prod. Nigeria Ltd. v. Nigerian Nat'l Petroleum Corp.*,
40 F.4th 56 (2d Cir. 2022) ...................................................31

*Europcar Italia, S.p.A. v. Maiellano Tours, Inc.*,
156 F.3d 310 (2d Cir. 1998) .................................................30

*First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*,
462 U.S. 611 (1983)...........................................................33

*First Options of Chicago, Inc. v. Kaplan*,
514 U.S. 938 (1995).........................................38, 40, 46, 49

*Garb v. Republic of Poland*,
440 F.3d 579 (2d Cir. 2006) .................................................52

*GE Energy Power Conversion France SAS, Corp. v. Outokumpu Stainless USA, LLC*,
590 U.S. 432 (2020).......................................................32, 34

*GEICO v. Fetisoff*,
958 F.2d 1137 (D.C. Cir. 1992)..............................................28

vi

*Grayson v. Warden, Comm'r, Alabama Doc*,
  869 F.3d 1204 (11th Cir. 2017) .......................................................26

*Henry Schein, Inc. v. Archer & White Sales, Inc.*,
  586 U.S. 63 (2019)...................................................................35, 38

*Hulley Enters. v Russian Fed'n*,
  [2025] EWCA (Civ) 108 (Eng.) ......................................................34

*Hulley Enters. Ltd. v. Russian Fed'n*,
  No. 14-cv-1996, 2023 WL 8005099 (D.D.C. Nov. 17, 2023)...........................42

*Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas
  Bumi Negara*,
  335 F.3d 357 (5th Cir. 2003) ........................................................32

*Lamps Plus, Inc. v. Varela*,
  587 U.S. 176 (2019)..................................................................46

*Lenchyshyn v. Pelko Elec., Inc.*,
  281 A.D.2d 42 (N.Y. App. Div. 2001) ................................................55

*LLC SPC Stileks v. Republic of Moldova*,
  985 F.3d 871 (D.C. Cir. 2021)...................................... 19, 20, 34, 35, 37, 38, 42

*Martin v. Dep't of Just.*,
  488 F.3d 446 (D.C. Cir. 2007).......................................................24

*NextEra Energy Glob. Holdings B.V. v. Kingdom of Spain*,
  112 F.4th 1088 (D.C. Cir. 2024)...........................................3, 18, 20, 48, 49, 56

*OJSC Ukrnafta v. Carpatsky Petroleum Corp.*,
  957 F.3d 487 (5th Cir. 2020) ........................................................43

*Olin Holdings Ltd. v. Libya*,
  73 F.4th 92 (2d Cir. 2023) .....................................................36, 37, 41

*Permanent Mission of India to the United Nations v.
  City of New York*,
  551 U.S. 193 (2007)..................................................................34

*Portland Gen. Elec. Co. v. Liberty Mut. Ins. Co.*,
  862 F.3d 981 (9th Cir. 2017) ........................................................37

*Pott v. World Cap. Props. Ltd.*,
   No. 21-cv-23942, 2024 WL 2874858 (S.D. Fla. Mar. 19, 2024) ......................38

*Process & Indus. Devs. Ltd. v. Fed. Republic of Nigeria*,
   27 F.4th 771 (D.C. Cir. 2022)........................................................44, 55

*Republic of India v Deutsche Telekom AG*,
   [2023] SGCA(I) 10 ..................................................................34

*Rodriguez v. FDIC*,
   589 U.S. 132 (2020)................................................................33

*Sanders v. Washington Metro. Area Transit Auth.*,
   819 F.2d 1151 (D.C. Cir. 1987)........................................................43

*Santos-Zacaria v. Garland*,
   598 U.S. 411 (2023)................................................................49

*Schneider v. Kingdom of Thailand*,
   688 F.3d 68 (2d Cir. 2012) .........................................................39

*Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co.,
   Kommanditgesellschaft v. Navimpex Centrala Navala*,
   989 F.2d 572 (2d Cir. 1993) .........................................................53

*Shaffer v. Heitner*,
   433 U.S. 186 (1977)................................................................54

*Simon v. Republic of Hungary*,
   77 F.4th 1077 (D.C. Cir. 2023).....................................................20, 27

*SS&C Techs., Inc. v. Consultores Pueblo Bonito, S.A. de C.V.*,
   847 F. App'x 527 (10th Cir. 2021) ..................................................24

*Tatneft v. Ukraine*,
   771 F. App'x 9 (D.C. Cir. 2019).................................................18, 53

*TermoRio S.A. E.S.P. v. Electranta S.P.*,
   487 F.3d 928 (D.C. Cir. 2007)....................................3, 29, 30, 31

*TIG Ins. v. Republic of Argentina*,
   110 F.4th 221 (D.C. Cir. 2024)................. 2, 19, 21, 22, 25, 28, 32, 42, 51

*Transaero, Inc. v. La Fuerza Aerea Boliviana*,
    30 F.3d 148 (D.C. Cir. 1994)................................................................52

*Valore v. Islamic Republic of Iran*,
    700 F. Supp. 2d 52 (D.D.C. 2010)....................................................27

*Wye Oak Tech., Inc. v. Republic of Iraq*,
    666 F.3d 205 (4th Cir. 2011) ............................................................51

## <u>Statutes</u>

9 U.S.C. § 207 ......................................................................................13

28 U.S.C. § 1291 .....................................................................................4

28 U.S.C. § 1330(a) .................................................................................4

28 U.S.C. § 1603(a) ...............................................................................52

28 U.S.C. § 1603(b)(1)...........................................................................52

28 U.S.C. § 1605(a)(1)...........................................................4, 5, 6, 20, 53

28 U.S.C. § 1605(a)(6)................................. 4, 5, 20, 21, 22, 48, 50, 51

D.C. Uniform Foreign-Country Money Judgments Act,
    D.C. Code §§ 15-362 to -371...................................... 14, 17, 20, 55-57

Federal Arbitration Act, Chapter II,
    9 U.S.C. §§ 201-08 ............................. 2, 13, 17, 20, 32-33, 35, 42-43, 49, 56-57

Foreign Sovereign Immunities Act,
    28 U.S.C. §§ 1602-11 .................. 2-5, 14-20, 25, 32-35, 42-44, 48-50, 52-55, 57

French Code Civ. Proc. art. 1447 (Westlaw).........................................30

French Code Civ. Proc., art. 1465 (Westlaw)........................................40

French Code Civ. Proc. art. 1506(1) (Westlaw) ....................................30

French Code Civ. Proc. art. 1527 (Westlaw).........................................13

New York Recognition of Foreign Country Money Judgments,
    N.Y. CPLR §§ 5301-08 .....................................................................55

State Immunity Act of 1978 (U.K.) .........................................................................34

## Treaties

Convention on the Execution of Foreign Arbitral Awards, Sept. 26,
1927, 92 L.N.T.S. 301 ..................................................................................31

Convention on the Recognition and Enforcement of Foreign Arbitral
Awards, June 10, 1958,
21 U.S.T. 2517 .................2-4, 13-14, 16-18, 21, 27, 29, 31-32, 34, 42, 53-55, 57

## Rules

Fed. R. Civ. P. 10 .....................................................................................................26

Fed. R. Civ. P. 10(c) ................................................................................................26

Fed. R. Civ. P. 44.1 ..................................................................................................24

## Other Authorities

Albert Jan van den Berg, The New York Arbitration Convention of
1958: Towards a Uniform Judicial Interpretation (1981)...................................29

Gary B. Born, International Commercial Arbitration (3d ed. 2021) ......................30

ICC, Arbitration Rules, art. 6(3) (Jan. 1, 2012) ....................................................36

ICC, Arbitration Rules, art. 6(9) (Jan. 1, 2012) ....................................................37

ICC, Arbitration Rules, art. 23(3) (Jan. 1, 2012) ..................................................39

John Bonazzo, This Week in Tech History: iTunes Store Opens,
Chernobyl Nuclear Explosion (Apr. 25, 2016),
https://tinyurl.com/4m4h9m72 .......................................................................51

Restatement (Second) of Judgments § 84(1) (1982) ..............................................43

Restatement (Third) U.S. Law of Int'l Comm. Arb. § 4.8(c) (2024) ....................31

The Daily, How NAFTA Broke American Politics (N.Y. Times, Oct. 8,
2024),
https://tinyurl.com/yc74nat9 ..........................................................................51

# <u>GLOSSARY</u>

| | |
|---|---|
| FAA | Federal Arbitration Act |
| FCC | Federal Communications Commission |
| FSIA | Foreign Sovereign Immunities Act |
| ICC | International Chamber of Commerce |
| PTRA | Post Offices and Telecommunications Regulatory Authority of Guinea |

## STATEMENT WITH RESPECT TO ORAL ARGUMENT

Given the complex and lengthy procedural history of this case, as well as the substantial sum at issue, Global Voice Group SA respectfully requests oral argument and the opportunity to answer any questions the Court may have.

## PRELIMINARY STATEMENT

Appellant Global Voice Group SA ("Global Voice") signed a Partnership Agreement with Appellee the Republic of Guinea ("Guinea") and the Post Offices and Telecommunications Regulatory Authority ("PTRA")—a Guinean government agency akin to the U.S. Federal Communications Commission ("FCC")—to provide valuable services that allowed Guinea to collect hundreds of millions of dollars of taxes on international telecommunications traffic.[1]  But the Guinean parties refused to pay Global Voice what they owed.  Global Voice offered to reduce its past bills and future compensation.  Guinea and the PTRA stonewalled, demanding to settle for pennies on the dollar.  So Global Voice took Guinea and the PTRA to arbitration in France under an Arbitration Agreement contained within the Partnership Agreement (collectively, the "Agreement").

Guinea argued in arbitration that it was not a party to the Agreement.  But an independent, three-arbitrator panel constituted by the International Chamber of Commerce ("ICC") rejected that argument, ruling that Guinea was both a party to and beneficiary of the Agreement because Guinea signed, benefitted from, performed under, and ultimately terminated the Agreement.  The Tribunal awarded Global Voice over $21 million (the "Arbitral Award").  Guinea then sued in the Paris Court of Appeal to overturn the Arbitral Award.  Guinea lost again.  The Paris Court

---

[1]  "Guinea" and "Guinean" refer to the Republic of Guinea.

1

of Appeal held that Guinea is, at minimum, a beneficiary of the Agreement based on the same above findings and entered a judgment confirming the Arbitral Award (the "French Judgment").

Global Voice moved to enforce the Arbitral Award and the French Judgment in the U.S. District Court for the District of Columbia under Chapter II of the Federal Arbitration Act, 9 U.S.C. §§ 201-08 ("FAA"), and the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, 21 U.S.T. 2517 (the "New York Convention"). But the district court (Cobb, J.) dismissed the case for lack of subject-matter jurisdiction under the Foreign Sovereign Immunities Act ("FSIA"), ruling that neither the arbitration nor the waiver exception applied because Guinea never agreed to arbitrate with Global Voice.

This ruling was legal error, and this Court should reverse.

The FSIA's arbitration exception applies because the Paris Court of Appeals and the Tribunal both held that Guinea was bound by the Agreement. The district court deemed both rulings irrelevant to the extent they concluded that Guinea was a "beneficiary" of the Agreement because, it believed, the FSIA's arbitration exception is satisfied only if Guinea was an original party to the Agreement. Yet this Court rejected that view in *TIG Insurance v. Republic of Argentina*, 110 F.4th 221, 223-24 (D.C. Cir. 2024). Under *TIG*, a foreign state that is a beneficiary of an arbitration agreement has "made" the agreement for purposes of the FSIA's arbitration

exception. The rulings of both Tribunals are issue preclusive. But even if issue preclusion did not apply, both rulings would still be conclusive under the FSIA. The Paris Court of Appeal's holding is, at minimum, conclusive evidence that Guinea is bound by the Agreement under French law. French law is controlling because the arbitration was held in France, and so France is the "primary jurisdiction" under the New York Convention. *See, e.g.*, *TermoRio S.A. E.S.P. v. Electranta S.P.*, 487 F.3d 928, 938-39 (D.C. Cir. 2007). And the Tribunal's ruling is conclusive because Guinea, at minimum, unmistakably delegated arbitrability to the Tribunal when it signed the Agreement and the arbitration's Terms of Reference.

But this Court should still find that the arbitration exception applies, even if it does not defer to the Paris Court of Appeal or the Tribunal. The district court ruled otherwise because, it believed, the Arbitration Agreement was limited to disputes between the PTRA and Global Voice. That is both irrelevant and incorrect. Under *NextEra Energy Glob. Holdings B.V. v. Kingdom of Spain*, 112 F.4th 1088 (D.C. Cir. 2024), "disputes about the scope of an arbitration agreement, such as whether a binding arbitration agreement covers a particular dispute, are not jurisdictional questions under the FSIA." *Id.* at 1101. The district court also incorrectly believed that Guinea signed the Partnership Agreement containing the Arbitration Agreement only as part of its "oversight" role over the PTRA. But even if this were true (it is not), Guinea would still have "made" the Arbitration Agreement because it (1) is a

beneficiary of the Agreement; and (2) gave the necessary sign-off for the Agreement to go into effect and bind its political subdivision.

Last, the FSIA's waiver exception applies independent of the arbitration exception. Guinea signed the New York Convention, agreed to arbitrate in France (another New York Convention signatory), arbitrated the merits, commenced the action before the Paris Court of Appeal, and lost. Guinea cannot be surprised that another New York Convention signatory, the United States, would enforce the underlying award and judgment entered upon it. Affirming the district court's contrary ruling would create a circuit split.

The Court should reverse and remand for further proceedings.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over this action under 28 U.S.C. § 1330(a), which provides that U.S. district courts have original jurisdiction over nonjury civil actions against a foreign state, so long as the foreign state is not entitled to immunity under the FSIA. *See id.* §§ 1605-1607. The arbitration and waiver exceptions, *id.* § 1605(a)(1) & (a)(6), both apply. *See infra*, Argument.

This Court has appellate jurisdiction under 28 U.S.C. § 1291. The district court's February 18, 2025 Order dismissing Global Voice's suit is a final order. J.A. __[ECF.43]. Global Voice timely appealed on March 12, 2025. J.A. __[ECF.46].

## STATEMENT OF ISSUES

**I.**    Whether the district court erred in ruling that the FSIA's arbitration exception did not apply to this suit.    J.A. __[ECF.44.at.17-28]; 28 U.S.C. § 1605(a)(6).

**II.**    Whether the district court erred in ruling that the FSIA's waiver exception did not apply to this suit.    J.A. __[ECF.44.at.28-31]; 28 U.S.C. § 1605(a)(1).

## BACKGROUND

### A.    The Partnership Agreement

Global Voice is a Seychelles company that provides monitoring and supervisory consulting services to the finance and telecom sectors and to state entities.  J.A.__[ECF.1.at.1] (¶1).  The PTRA is a Guinean state regulator governed by public law and supervised by the Guinean Minister of Telecommunications and New Information Technologies.  J.A.__[ECF.4-5.at.2] (¶2); J.A.__[ECF.4-6.at.3].

In May 2009, Global Voice entered the Agreement with the PTRA and Guinea, under which Global Voice would provide and install tools to enable Guinea to view and tax all international telecommunications traffic into and out of the country.  J.A.__[ECF.4-6].  The Agreement's initial duration was five years, with an automatic renewal period of two years.  J.A.__[ECF.4-6.at.5].

The Agreement explained the contract's purposes. The preamble enumerated Guinea's need to both provide the PTRA with "adequate tools" and "control the flow of local and international telephone traffic in order to adopt the taxation regime most appropriate to the fiscal and socio-economic needs and realities of the Republic of Guinea." J.A.__[ECF.4-6.at.3]. The Agreement also noted Guinea's "policy to better manage the traffic volumes of landline and mobile operators in Guinea," J.A.__[ECF.4-6.at.3], and recognized how Global Voice's services would benefit Guinea, *see, e.g.*, J.A.__[ECF.4-6.at.4]. The purpose of the Agreement was to accredit and certify Global Voice as a "neutral and independent operator on behalf of the PTRA and the State of Guinea." *Id.* Global Voice agreed to "[p]rovide and install control tools for the State of Guinea, giving it the capacity to view and bill all local and international traffic of each operator in real time." J.A.__[ECF.4-6.at.5]. Global Voice also committed to help the PTRA "protect the Republic of Guinea's telecommunications market against the decline in tariffs that represents a huge loss for the public treasury." J.A.__[ECF.4-6.at.6].

The contract compensated Global Voice at a rate of $0.07/minute for international calls into Guinea. J.A.__[ECF.4-6.at.12]; J.A.__[ECF.4-5.at.2] (¶5). Global Voice's compensation required approval by a Guinean cabinet minister; the minister's May 2009 decree set the threshold rate for international calls entering

Guinea at $0.28 per minute and allocated revenues to fulfill Global Voice's $0.07 rate under the Agreement. J.A.__[ECF.4-5.at.9] (¶48); J.A.__[ECF.4-1.at.7] (¶11).

Article 17 of the Agreement covered dispute resolution. J.A.__[ECF.4-6.at.11]. Article 17 contained the Arbitration Agreement, which required that all disputes arising out of the contract and later amendments to it be subject to "the exclusive jurisdiction of the Arbitration Rules of the [ICC] in Paris by one or more arbitrators appointed in accordance with these Rules." J.A.__[ECF.4-6.at.11].

Article 17 also provided that Guinean law would govern the Partnership Agreement. J.A.__[ECF.4-6.at.11].

The Agreement listed two entities as "Parties": Global Voice and the PTRA. J.A.__[ECF.4-6.at.2]. But three people signed the contract: (1) Patrick Sinclair, a Global Voice project director; (2) Nfa Ousmane Camara, the PTRA's Director General; and (3) Colonel Mathurin Bangoura, Guinea's then-Minister of Telecommunications and New Information Technologies. J.A.__[ECF.4-6.at.11]. Minister Bangoura signed and stamped the Partnership Agreement in his official capacity as Guinea's Minister of Telecommunications and New Information Technologies. J.A.__[ECF.4-6.at.22].

### B.    The Amendment And Addendum

In July 2009, Global Voice's CEO, Director General Camara, and Minister Bangoura signed a subsequent "Amendment" to the Agreement, which extended the

contract to six years and required Global Voice to fund the cost of a new PTRA building.  J.A.__[ECF.4-7.at.2-3].  The Amendment otherwise affirmed that "the clauses of the [Agreement] remain fully applicable."  J.A.__[ECF.4-7.at.4].  Here again, Minister Bangoura signed and stamped the agreement in his official capacity. J.A.__[ECF.4-7.at.4].

Global Voice held up its end of the bargain, setting up the required tools and systems and providing support to Guinea and the PTRA.  J.A.__[ECF.4-1.at.9-10]. But Global Voice's invoices were not fully paid, and by December 2011, the PTRA owed Global Voice over $13 million.  J.A.__[ECF.4-8.at.3].  Global Voice and the PTRA eventually entered into a June 2012 "Addendum" to the Agreement, which slashed both the PTRA's then-existing obligations and Global Voice's future compensation.  J.A.__[ECF.4-8.at.3-4].  The Addendum, which did not alter the Arbitration Agreement, was signed by the PTRA's new Director General and a Global Voice managing director.  J.A.__[ECF.4-8.at.4].

In May 2014, the PTRA stopped paying Global Voice's invoices. J.A.__[ECF.4-5.at.4] (¶8); J.A.__[ECF.4-1.at.11] (¶30).  Later, and in consultation with Guinea, the PTRA informed Global Voice that the PTRA's obligations had ended in May 2014, J.A.__[ECF.4-5.at.9] (¶¶50-51)—even though the Agreement lasted until May 2017 under the Amendment, J.A.__[ECF.4-1.at.11] (¶32).  Global Voice requested payment in full and tried to settle with both the PTRA and Guinea.

J.A.__[ECF.4-1.at.11-13] (¶¶38-44). In September 2015, Guinea offered to settle the PTRA's liability at a fraction of its outstanding obligations; Global Voice declined. J.A.__[ECF.4-1.at.13] (¶45).

### C.    The ICC Arbitration

In December 2016, Global Voice invoked the Arbitration Agreement and filed a request with the ICC for arbitration of its payment dispute with Guinea and the PTRA. J.A.__[ECF.4-1.at.14] (¶49). The ICC constituted a three-person Arbitral Tribunal in Paris, France. J.A.__[ECF.4-1.at.14] (¶53). Guinea and the PTRA agreed to participate in the ICC arbitration. J.A.__[ECF.4-1.at.14-16] (¶¶50-74).

Global Voice, Guinea and the PTRA submitted a summary of their arguments for inclusion in the arbitration's "Terms of Reference." J.A.__[ECF.4-1.at.17] (¶¶78-79). The Terms of Reference, which all three parties to the arbitration signed, is a contract in which the parties specify the claims they are submitting to arbitration, and agree on the applicable law and procedural rules, among other things. J.A.__[ECF.30-4.at.83-84]. In the Terms of Reference, Guinea, the PTRA, and Global Voice again agreed to abide by the 2012 ICC Rules of Arbitration. J.A.__[ECF.30-4.at.37] (¶150).

The Terms of Reference included a section drafted by Guinea and the PTRA describing their defense that the Arbitral Tribunal lacked jurisdiction over Global Voice's claims against Guinea because Guinea was "never a party to the Partnership

Agreement." J.A.__[ECF.30-4.at.25-27] (¶¶110-17). Guinea and the PTRA stated, in their section of the Terms of Reference, that the Tribunal "must" decide this jurisdictional objection. J.A.__[ECF.30-4.at.26] (¶114). But Guinea and the PTRA also raised several merits arguments in the Terms of Reference, including that:

- the Partnership Agreement, Amendment, and Addendum should be declared null and void on the merits;

- Guinea and the PTRA should be each be awarded at least $100,000 to compensate them for Global Voice's "moral damage" and "abuse of process" (*i.e.*, Global Voice's filing the arbitration request); and

- as a counterclaim by the PTRA, Global Voice should disgorge sums "unduly received" under the allegedly void contracts and pay an unspecified amount of damages.

J.A.__[ECF.30-4.at.27-36] (¶¶118-48).

The arbitration hearing was held over three days, during which Guinea and the PTRA presented witnesses and made arguments on both the Arbitral Tribunal's jurisdiction and the merits. J.A.__[ECF.4-1.at.18] (¶91).

In July 2019, the Arbitral Tribunal issued the Arbitral Award for Global Voice. J.A.__[ECF.4-1, 4-2]. In rejecting Guinea's arbitrability challenges to the Tribunal's jurisdiction, the Tribunal found that there was a "close interweaving of [Guinea] and the PTRA as beneficiaries" of the Agreement; the Agreement enabled Guinea to

"collect some USD 212 million in tax revenue;" and Guinea "active[ly] participat[ed] … throughout the contractual process, from its conclusion to its termination, including its execution." J.A.__[ECF.4-1.at.29] (¶¶146-47). The Tribunal also highlighted a May 2009 Guinean ministerial decree, which had tasked Guinea with "no less than twelve specific responsibilities …. essential to the implementation and proper functioning" of the Agreement. J.A.__[ECF.4-1.at.29] (¶149). The Tribunal thus concluded that the evidence "clearly establish[ed] that [Guinea] was a party to the Partnership Agreement," "considered itself … bound by its terms and by the Arbitration Agreement," and "knew it was the beneficiary of" the Agreement. J.A.__[ECF.4-1.at.30] (¶152). Accordingly, the Tribunal concluded it had jurisdiction over Guinea and dismissed Guinea's arbitrability objection. J.A.__[ECF.4-2.at.36] (¶380a-b).

Proceeding to the merits, the Arbitral Tribunal held that the Agreement, Amendment, and Addendum were all lawful contracts; that Global Voice fulfilled its relevant obligations under the same; and that Guinea and the PTRA improperly terminated the Agreement. J.A.__[ECF.4-2.at.36] (¶380c-e). The Tribunal awarded Global Voice over $21 million in damages, plus interest, costs, and fees. J.A.__[ECF.4-2.at.36] (¶¶380f-h). The Tribunal also rejected the PTRA's counterclaim. J.A.__[ECF.4-2.at.36] (¶380c).

### D. The French Court Proceedings

In September 2020, Guinea and the PTRA sought to annul the Arbitral Award by appeal to the Court of Appeal in Paris, France. J.A.__[ECF.4-5.at.4-5] (¶¶14, 20). As to arbitrability, Guinea conceded that Minister Bangoura had signed the Agreement and that the May 2009 ministerial decree did implement the Agreement. J.A.__[ECF.4-5.at.7] (¶38). Yet Guinea maintained that it was not "a party to the Partnership Agreement" and thus the Tribunal had no jurisdiction over it. J.A.__[ECF.4-5.at.7] (¶¶37-38).

In September 2021, the Paris Court of Appeal rejected Guinea's arbitrability objection to the Arbitral Tribunal's jurisdiction. Echoing the Tribunal, the French court stated that an arbitration clause could be extended to "a person, who, despite not being expressly mentioned as a 'party' to the contract that includes the arbitration clause, is directly involved in the performance of the contract, in accordance with the common will of the parties, and the circumstances of the case, and has an interest in the benefits of this contract." J.A.__[ECF.4-5.at.8] (¶40). And Guinea signed the Agreement and the Amendment. J.A.__[ECF.4-5.at.8] (¶41). The Agreement "directly and expressly refer[red]" to Guinea's expectations and interests, and Guinea was a "direct beneficiary" of the Agreement. J.A.__[ECF.4-5.at.8-9] (¶¶42-49). Finally, Guinea was involved in the execution and termination of the Agreement, a role that "ranged far beyond that of the [PTRA's] supervisory

authority." J.A.__[ECF.4-5.at.9] (¶¶49-52). Thus, the court dismissed Guinea's jurisdictional challenge. J.A.__[ECF.4-5.at.10] (¶54).

The Paris Court of Appeal rejected Guinea and the PTRA's remaining arguments for annulment of the Arbitral Award. J.A.__[ECF.4-5.at.10-19] (¶¶55-132). By denying Guinea and the PTRA's request for annulment, the Paris Court of Appeal confirmed and recognized the Arbitral Award under French law. J.A.__[ECF.4.at.7] (¶23); *see* French Code Civ. Proc. art. 1527 (Westlaw) (¶2) ("A decision denying an appeal or application to set aside an award shall be deemed an enforcement order of the arbitral award or of the parts of the award that were not overturned by the court.").

In August 2022, and while the underlying lawsuit was pending in the district court, *infra* pp.13-14, Guinea and the PTRA asked France's highest court, the Court of Cassation, to undertake a limited review of the Paris Court of Appeal's decision. J.A.__[ECF.44.at.6]. Guinea did not challenge the lower court's jurisdictional holding. J.A.__[ECF.42-1.at.3-5] (¶4). In July 2024, the Court of Cassation rejected Guinea and the PTRA's appeal. J.A.__[ECF.42-1.at.6].

### E.    Proceedings Below

In July 2022, Global Voice sued Guinea in the U.S. District Court for the District of Columbia. J.A.__[ECF.1]. Global Voice asked the district court to enforce the Arbitral Award under 9 U.S.C. § 207 of the FAA and the New York

Convention. J.A.__[ECF.1.at.9-10] (¶¶35-41). Global Voice also asked the court to recognize and enforce the French Judgment against Guinea under the D.C. Uniform Foreign-Country Money Judgments Act (the "Recognition Act"), D.C. Code §§ 15-362 to -371. J.A.__[ECF.1.at.10-12] (¶¶42-53). Relying on the FSIA's arbitration and waiver exceptions, Global Voice asked the court to enter judgment against Guinea for more than $21 million, plus interest, fees, and costs. J.A.__[ECF.1.at.3-4, 12-13].

After defaulting at first, Guinea appeared and moved to set aside the default and to dismiss Global Voice's complaint for lack of subject-matter jurisdiction. J.A.__[ECF.44.at.7]. Arguing again that it was not a party to the Agreement, Guinea asserted that the FSIA's arbitration and waiver exceptions did not apply. J.A.__[ECF.44.at.7].[2]

In February 2025, the district court dismissed the action. J.A.__[ECF.44]. As relevant here, the district court ruled that, because neither of the asserted FSIA exceptions applied, it lacked subject-matter jurisdiction. J.A.__[ECF.44.at.17-31].

The district court began with the FSIA's arbitration exception and whether Guinea agreed to arbitrate claims under the Agreement. J.A.__[ECF.44.at.17-28]. The court acknowledged Global Voice's argument that the Arbitration Agreement

---

[2] Guinea also challenged service of process. J.A.__[ECF.44.at.7]. The district court did not reach this issue, which is not at issue on appeal.

required disputes to be arbitrated according to the 2012 ICC Rules, which delegated arbitrability to the Tribunal, and that the Tribunal had decided that question against Guinea. J.A.__[ECF.44.at.18-28]. But the court ruled that it was required to either find *de novo* that Guinea had agreed to arbitrate claims under the Agreement or find "clear and unmistakable" evidence that it agreed to delegate the arbitrability question to the Tribunal, J.A.__[ECF.44.at.24]. On delegation, the court questioned but did not decide whether, under the FSIA, a court "may ever defer to an arbitrator's determination that the foreign state was a party to the underlying arbitration agreement." J.A.__[ECF.44.at.23] (declining to answer that "open question").

As to *de novo* review of Guinea's agreement to arbitrate, the court quickly dismissed the fact that Guinea's Minister signed the Agreement and Arbitration Agreement: Guinea was not listed as a "Party" to the Partnership Agreement, and the district court characterized the Minister's signature as a mere "routine sign-off." J.A.__[ECF.44.at.24-25]. The court diminished the importance of both the Arbitral Tribunal's and Paris Court of Appeal's finding that Guinea was involved with and benefited from the Agreement. J.A.__[ECF.44.at.24-26]. What mattered, according to the district court, was that the Arbitration Agreement applies only to the entities identified as "Parties" to the Partnership Agreements. J.A.__[ECF.44.at.26]. The district court also questioned why those decisions, which were based on "French contract law," were relevant in the FSIA context. J.A.__[ECF.44.at.26].

Turning to delegation, the district court found that Guinea had not delegated arbitrability to the Arbitral Tribunal. Acknowledging that parties who agree to arbitrate under the ICC Rules delegate arbitrability to the to the Tribunal, the court found that Guinea had not agreed to incorporate the ICC rules because it was not identified as a "Party" to the Partnership Agreement. J.A.__[ECF.44.at.27]. The court also dismissed Guinea's participation in the ICC arbitration and its signing of the Terms of Reference as irrelevant. J.A.__[ECF.44.at.27-28]. As a result, the court ruled that the FSIA's arbitration exception did not apply. J.A.__[ECF.44.at.28].

Finally, the district court disposed of the FSIA's waiver exception. J.A.__[ECF.44.at.28-31]. The court ruled that Guinea, by signing the New York Convention, did not waive its immunity against lawsuits to enforce arbitral awards or judgments enforcing such awards. J.A.__[ECF.44.at.29-30]. To waive its immunity, Guinea would have had to agree to arbitrate the "*particular* dispute" in an arbitration conducted in a forum that had signed the Convention. J.A.__[ECF.44.at.29-30] (emphasis added). Because the court found that Guinea had not agreed to arbitrate claims arising out of the Partnership Agreement, it rebuffed the application of the waiver exception. J.A.__[ECF.44.at 29-31].

Having rejected both the FSIA's arbitration and waiver exceptions, the district court ruled that it lacked subject-matter jurisdiction and dismissed the case. J.A.__[ECF.44.at.33-34]; J.A.__[ECF.43].

# SUMMARY OF ARGUMENT

The Court should hold that the FSIA's arbitration and waiver exceptions apply and reverse the district court's decision dismissing Global Voice's FAA and Recognition Act claims for lack of jurisdiction.

**I.** The district court erred in holding that the FSIA's arbitration exception does not apply to Global Voice's lawsuit against Guinea. The district court based its holding solely on its finding that Guinea had not agreed to arbitrate in the Arbitration Agreement. But that is wrong, for three reasons.

*First*, the Paris Court of Appeal concluded that Guinea was bound by the Agreement. That ruling is both issue preclusive and conclusive. Guinea fully and fairly litigated the issue in France. Independent of issue preclusion, the ruling is also conclusive as a matter of French law. And French law governs whether Guinea is bound by the Agreement because France was the arbitral seat and thus the "primary jurisdiction" under the New York Convention.

*Second*, the Arbitral Tribunal determined that Guinea is bound by the Agreement. That ruling is issue preclusive. Even if it were not preclusive, Guinea delegated arbitrability to the Tribunal when it signed the Agreement and the Terms of Reference, and so the Tribunal's decision controls.

*Finally*, even if this Court did not defer to either prior tribunal, Guinea "made" the Arbitration Agreement. Guinea was a party to the Arbitration Agreement

because it signed the Agreement, performed under it, and terminated the Agreement. Guinea was not, to be sure, a defined "Party" to the Partnership Agreement, but the Arbitration Agreement is severable from the Partnership Agreement. *See Belize Social Dev. Ltd. v. Gov't of Belize*, 794 F.3d 99, 102 (D.C. Cir. 2015). The district court also ruled that the Arbitration Agreement's scope does not cover claims against Guinea. That is wrong, but, in any case, "[i]t is well established in this Circuit that disputes about the scope of an arbitration agreement, such as whether a binding arbitration agreement covers a particular dispute, are not jurisdictional questions under the FSIA." *NextEra*, 112 F.4th at 1101. Last, Guinea, at minimum, is a third-party beneficiary of the Agreement under U.S. law and also caused the Agreement to go into effect by giving the PTRA the necessary sign-off. Either point establishes that Guinea "made" the Agreement under *TIG* and the FSIA.

**II.** The district court erred in holding that the FSIA's waiver exception does not apply to Global Voice's lawsuit against Guinea. "[A] sovereign, by signing the New York Convention," and agreeing to arbitrate in a country that has also ratified the New York Convention, "waives its immunity from arbitration-enforcement actions in other signatory states." *Tatneft v. Ukraine*, 771 F. App'x 9, 10 (D.C. Cir. 2019). Guinea not only signed the New York Convention and agreed to arbitrate in France (another New York Convention signatory), but it also actively participated in the arbitration and then initiated proceedings in the Paris Court of Appeal to set aside

the Arbitral Award. This litigation conduct constitutes an implied waiver of sovereign immunity. The district court's contrary ruling improperly focused on whether Guinea was party to the Partnership Agreement and ignored *TIG*'s holding that waiver depends on a state's objective conduct, not subjective intent.

## STANDARD OF REVIEW

The Court reviews a dismissal for lack of subject-matter jurisdiction *de novo* as to questions of law. *TIG*, 110 F.4th at 230.

## ARGUMENT

"Under the FSIA, foreign governments are generally immune from the jurisdiction of federal and state courts." *LLC SPC Stileks v. Republic of Moldova*, 985 F.3d 871, 877 (D.C. Cir. 2021). "But the FSIA also established various exceptions, which provide 'the sole basis for obtaining jurisdiction over a foreign state in our courts.'" *Id.* (internal citations omitted) (quotation omitted). When a plaintiff has asserted jurisdiction under the FSIA and the foreign state asserts "the jurisdictional defense of immunity," the defendant state "bears the burden of proving that the plaintiff's allegations do not bring its case within a statutory exception to immunity." *Belize Soc. Dev.*, 794 F.3d at 102 (citation omitted). So long as the foreign state's jurisdictional dispute challenges only the "legal sufficiency" of the petitioner's allegations, the "court should take the petitioner's factual allegations as true" and "draw all reasonable inferences in [the plaintiff's] favor." *Simon v.*

*Republic of Hungary*, 77 F.4th 1077, 1116 (D.C. Cir. 2023) (quotation omitted; alteration in original).

Here, the district court erred in dismissing Global Voice's complaint for lack of subject-matter jurisdiction under the FSIA. Both the FSIA's arbitration and waiver exceptions applied in this case. *See* 28 U.S.C. § 1605(a)(1) & (a)(6). This Court should reverse the order below and remand for consideration of the merits of Global Voice's FAA and Recognition Act claims.

## I.    The District Court Had Subject-Matter Jurisdiction Under The FSIA's Arbitration Exception

The FSIA's arbitration exception provides, as relevant here, that "[a] foreign state shall not be immune … in any case—in which the action is brought, either to enforce an agreement made by the foreign state … or to confirm an award made pursuant to such an agreement to arbitrate, if … the agreement or award is or may be governed by a treaty or other international agreement in force for the United States calling for the recognition and enforcement of arbitral awards …." *Id.* § 1605(a)(6)(B). Thus, when a party seeks to enforce an arbitral award under this provision, the elements are "[1] the existence of an arbitration agreement [made by the foreign state] [2] an arbitration award and [3] a treaty governing the award." *Stileks*, 985 F.3d at 877. "In assessing these jurisdictional facts," this Court applies "a burden-shifting framework." *NextEra*, 112 F.4th at 1100. "The plaintiff must initially satisfy a burden of production as to these facts, which when met requires

the foreign sovereign to 'establish the absence of the factual basis by a preponderance of the evidence.'" *Id.* (citation omitted).

Here, the second and third elements are undisputedly satisfied. Global Voice attached to its complaint a copy of "the tribunal's decision," which establishes the existence of the Arbitral Award. *Id.*; *see* J.A.___[ECF.4-1 to 4-4]. And the New York Convention undisputedly governs the arbitral award. J.A.___[ECF.44.at.10, 18-19]; *see Chevron Corp. v. Ecuador*, 795 F.3d 200, 204 n.2 (D.C. Cir. 2015) (the "international agreement" element is met if the award "is *or may be* governed by" the New York Convention) (emphasis in original) (quoting 28 U.S.C. § 1605(a)(6)). The only contest is over the first element: whether there is an arbitration agreement "made by" Guinea. 28 U.S.C. § 1605(a)(6).

In *TIG*, this Court clarified the scope of the arbitration exception's first element. *TIG* rejected the notion that a foreign state must be an "original party" to the arbitration agreement at issue. *See* 110 F.4th at 231. "'[M]ake'—the word stem of 'made'—can mean '[t]o cause to exist'; '[t]o form, fashion or produce'; or '[t]o do, perform, or execute,'" this Court acknowledged. *Id.* at 232 (citation omitted; alterations in original). But "making a contract or agreement is commonly understood to include later adoption of that agreement." *Id.* Thus, the phrase "made by" could also encompass a non-signatory sovereign that "takes actions that cause it to adopt and become subject to the agreement." *Id.* "[B]ackground" or "external"

"common-law contract principles [] inform … what constitutes the 'making' of an 'agreement.'" *Id.* at 234. Citing *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 631 (2009), *TIG* held that non-parties "make" arbitration agreements through a variety of means, including "assumption, piercing the corporate veil, alter ego, incorporation by reference, third-party beneficiary theories, waiver, and estoppel." 110 F.4th at 234. *TIG* left open, however, what substantive law governs these background contract principles, and remanded to the district court to consider this choice-of-law issue. *Id.* at 235.

Here, the district court ruled that the first element of the arbitration exception was not satisfied because Guinea never agreed to the Arbitration Agreement. J.A.__[ECF.44.at.17-28]. That was error. Both the Paris Court of Appeal and the Tribunal found that Guinea is bound by the Agreement. The district court erred as a matter of law in ignoring their binding rulings. Even if these rulings were not controlling (they are), Guinea was a party to, or, at minimum, "made" the Arbitration Agreement under 28 U.S.C. § 1605(a)(6).

## A. The Paris Court Of Appeal Conclusively Found That Guinea Was Bound By The Agreement

The Paris Court of Appeal has already concluded that Guinea is bound by the Agreement under "third-party beneficiary theories." *TIG*, 110 F.4th at 234. Guinea sought annulment of the Arbitral Award in the Paris Court of Appeal based, in part,

on its argument that Guinea was not a party to the Arbitration Agreement. J.A.__[ECF.4-5.at.6] (¶¶37-38).

The Paris Court of Appeal rejected that challenge, holding that Guinea was a "direct beneficiary" of the Partnership Agreement containing the Arbitration Agreement. J.A.__[ECF.4-5.at.7, 9] (¶¶41-42, 54). "[S]everal paragraphs of the Agreement directly and expressly refer to the Republic of Guinea's expectations," the Paris Court of Appeal explained. J.A.__[ECF.4-5.at.7] (¶42). The Agreement's Preamble states that the PTRA was entering into the Partnership Agreement because "the State" required Global Voice's assistance in developing Guinea's regulatory "tools" and fostering an "appropriate taxation system." J.A.__[ECF.4-5.at.7] (¶43). Several provisions in the Partnership Agreement also "mention the benefits of this Agreement for the 'Republic of Guinea.'" J.A.__[ECF.4-5.at.7] (¶45). For example, in Articles 3.1 & 3.2, Global Voice agreed to help monitor "the flows and taxation of international calls for the Guinean State," "[d]efine new taxes on incoming international calls," and "provide and install monitoring tools for the Guinean State." J.A.__[ECF.4-5.at.7-8] (¶¶46-47). Guinea also effectuated the Agreement when it issued the May 2009 ministerial decree, which set the international rate for telephone calls into Guinea and Global Voice's compensation for such calls. J.A.__[ECF.4-5.at.8] (¶48). And Guinea chose to "terminate the contractual relationship" between Global Voice and PTRA. J.A.__[ECF.4-5.at.8] (¶¶50-51). Thus, "Guinea also had

a direct interest in the benefits of this contract and was involved in the execution of the Partnership Agreement, and took on a role that ranged far beyond that of the [PTRA's] supervisory authority." J.A.__[ECF.4-5.at.8] (¶52). It followed that Guinea was a "beneficiary" of the Agreement. J.A.__[ECF.4-5.at.7] (¶42).

The Paris Court of Appeal's findings and ultimate holding that Guinea is bound by the Agreement are issue preclusive under the three "elements" of issue preclusion: (1) the issues are the same, (2) the parties fully litigated them, and (3) applying preclusion would not work an injustice. *See Martin v. Dep't of Just.*, 488 F.3d 446, 454 (D.C. Cir. 2007). The holding involves the same issues as here, those issues were fully litigated, and applying preclusion would not work an unfairness given that Guinea chose to commence the French action. Moreover, preclusion aside, the Paris Court of Appeal's holding is, at minimum, persuasive evidence that, under French law, Guinea is bound by the Arbitration Agreement, which should govern, as explained below, *infra*, pp.29-34. This Court must resolve all questions of French law *de novo*. *See* Fed. R. Civ. P. 44.1. But a foreign "appellate" court's interpretation of its own "law" as applied to the very dispute "at issue" is the best evidence of foreign law. *SS&C Techs., Inc. v. Consultores Pueblo Bonito, S.A. de C.V.*, 847 F. App'x 527, 530 (10th Cir. 2021); *see, e.g.*, *Bodum USA,*

*Inc. v. La Cafetiere, Inc.*, 621 F.3d 624, 629-30 (7th Cir. 2010) (following a French court's decision over expert declarations that "add[] an adversary's spin").[3]

The district court declined to treat as binding the Paris Court of Appeal's holding that Guinea is bound by the Arbitration Agreement for three reasons. None are persuasive.

### 1.  The District Court Failed To Apply *TIG*

The district court wrongly ruled that the Paris Court of Appeal was irrelevant because it believed that the FSIA requires that a foreign state be a party to the arbitration agreement, and that third-party "beneficiary" theories do not suffice. J.A.__[ECF.44.at.21-22, 26]. But *TIG* rejected this argument, holding that a foreign state would have "made" an arbitration agreement if it is bound to the agreement by "third-party beneficiary theories." 110 F.4th at 231-34. The district court's primary reason for ignoring the Paris Court of Appeal's holding is thus wrong under D.C. Circuit precedent.

---

[3]  The Paris Court of Appeal's legal conclusion that Guinea is a "beneficiary" of and bound by the Agreement is preclusive even if this Court rejects Global Voice's choice-of-law arguments (*infra*, pp.29-34) because the Paris Court of Appeal decided that French law applies, and that ruling is itself issue preclusive. *See infra*, p.28.

## 2. The District Court Failed To Apply Issue Preclusion And Fed. R. Civ. P. 10

The district court also did not want to credit the Paris Court of Appeal's findings because Global Voice "did not attach to its filings any of the evidentiary documents" that the French Judgment "relied upon or cited." J.A.__[ECF.44.at.26].

This was legal error too. To start, there was no need to consider whether to take judicial notice of fact findings because the Paris Court of Appeal's findings were preclusive. Questions of judicial notice arise only when issue preclusion does not apply. *See, e.g.*, *Grayson v. Warden, Comm'r, Alabama Doc*, 869 F.3d 1204, 1225 (11th Cir. 2017) (recognizing that judicial notice and issue preclusion are not "superfluous" and cover different situations) (citation omitted).

But even if the French Judgment were not preclusive but just served as persuasive evidence of French law (which governs, *see infra*, pp.29-34), the court was required to consider it and take it as true on Guinea's motion to dismiss. Global Voice appended the French Judgment to a declaration it filed concurrently with its Complaint, which in turn repeatedly references the Arbitral Award, J.A.__[ECF.1]. The French Judgment was thus part of Global Voice's pleadings. *See* Fed. R. Civ. P. 10(c); *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997) ("[W]e may consider … any documents either attached to or incorporated in the complaint …."). Guinea never challenged the factual accuracy of the Paris Court of

Appeal's findings, and so the district court had to take those findings "as true and draw all reasonable inferences in the plaintiff's favor." *Simon*, 77 F.4th at 1116.

The district court's citations are not to the contrary. J.A.__[ECF.44.at.26 n.8]. These cases merely declined to take judicial notice of factual findings from prior default judgments on a motion to enter judgment against a foreign state. *E.g.*, *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 59 (D.D.C. 2010). Here, by contrast, the French Judgment was issue preclusive, which did not arise in cases like *Valore* because prior "default judgments do not have preclusive effect." *Campaign Legal Ctr. v. 45Committee, Inc.*, 118 F.4th 378, 389 (D.C. Cir. 2024). And at least as to the motion to dismiss, the French Judgment's findings had to be accepted as true because they went unchallenged and were part of the pleadings. *Supra*, pp.26-27.

### 3. The District Court Failed To Apply The Law Governing Conflict-Of-Laws And New York Convention

Last, the district court wrongly noted that the Paris Court of Appeal made its ruling based on "French [] law," and the district court blamed Global Voice for failing to explain why French law governs. J.A.__[ECF.44.at.26]. The district court ignored Global Voice's argument below that the Paris Court of Appeal's decision controlled because it had "primary jurisdiction over the arbitration and the award." J.A.__[ECF.40.at.3]. *TIG*, to be sure, left open what law governs this issue. *See* 110 F.4th at 235. But D.C. Circuit precedent establishes that French law—the law of the "primary jurisdiction" where the arbitration took place—should control.

To be clear, this Court need not resolve the choice-of-law issue *TIG* left open, for two reasons. *First*, the Paris Court of Appeal held, after the parties fully and fairly litigated the issue, that French law governs whether Guinea is bound by the Agreement. J.A.__[ECF.4-5.at.6] (¶¶31-33). This ruling that French law applies is thus issue preclusive, for the reasons explained above, *supra*, pp.23-24, 25 n.3, even if it departs from this Court's preferred choice-of-law approach.

*Second*, no choice-of-law analysis is needed because there is no "true conflict" between the law of competing jurisdictions. *GEICO v. Fetisoff*, 958 F.2d 1137, 1141 (D.C. Cir. 1992). Guinea never argued below that it would not qualify as a "beneficiary" of the Agreement under U.S., French, Guinean, or any other law. Guinea thus waived the issue because Guinea bore "the burden of proving that [Global Voice's] allegations do not" satisfy "a statutory exception to immunity." *Belize Social Dev.*, 794 F.3d at 102 (quotation omitted). Waiver aside, there is no conflict. As the Paris Court of Appeal found, the Agreement's own words explain that it was designed to help develop Guinea's regulatory "tools" and improve its "taxation system." J.A.__[ECF.4-5.at.7-8] (¶¶42-48). That establishes that Guinea would qualify as a third-party beneficiary bound by the Agreement under U.S. law. *See, e.g.*, *Cargill Int'l S.A. v. M/T Pavel Dybenko*, 991 F.2d 1012, 1019 (2d Cir. 1993) (a third party is a beneficiary if "the parties to that contract intended to confer a benefit on it when contracting") (quotation omitted). There is no dispute that

Guinea is a beneficiary bound by the Agreement under French law: Again, the Paris Court of Appeal's holding is the best evidence of French law on this issue. *Supra*, pp.24-25. And Guinea, the PTRA, Global Voice, and the Arbitral Tribunal seemed to accept during the arbitration that Guinean law tracked French law, as the parties cited French and Guinean law interchangeably. J.A.__[ECF.4-1.at.27-28] (¶145).

That said, if this Court does reach the choice-of-law issue *TIG* left open, French law should govern whether Guinea is bound because France was the seat of the arbitration. The New York Convention "mandates very different regimes for the review of arbitral awards (1) in the state in which, or under the law of which, the award was made" (the primary jurisdiction) "and (2) in other states where recognition and enforcement are sought" (secondary jurisdictions). *TermoRio*, 487 F.3d at 935 (quotation omitted). France, as the seat of the arbitration, is the "primary jurisdiction," meaning that its judiciary is the "competent authority" to "set aside or modify an award in accordance with its domestic arbitral law." *Id.* (quotation omitted); *see* New York Convention, arts. V(1)(e) & V(2).[4]

---

[4] While the Partnership Agreement includes a general choice-of-law clause selecting Guinean law, France is the primary jurisdiction. And when an agreement "contains a general choice of law clause," but "provides in the arbitral clause that arbitration is to be held in a country with a different law, the latter indication must be deemed to prevail over the former." *Balkan Energy Ltd. v. Republic of Ghana*, 302 F. Supp. 3d 144, 152 (D.D.C. 2018) (quoting Albert Jan van den Berg, The New York Arbitration Convention of 1958: Towards a Uniform Judicial Interpretation 293 (1981)). Arbitration clauses are "separable" from the underlying contracts

Courts of secondary jurisdictions (including here), where enforcement of the award is sought, apply a "limited scope of review" as compared to the primary jurisdiction, which "favors deference" to the primary jurisdiction. *Europcar Italia, S.p.A. v. Maiellano Tours, Inc.*, 156 F.3d 310, 317 (2d Cir. 1998). Deference to the primary jurisdiction is necessary to avoid "undesirable consequences" that would result if no jurisdiction had primacy. *TermoRio*, 487 F.3d at 936. Otherwise, "a losing party" could continuously relitigate its position "from country to country until a court is found" that accepted its arguments. *Id.* (quotation omitted).

Deference to the primary jurisdiction also respects the parties' intent. By agreeing to arbitrate in France, they agreed that French courts would "be bound by" French procedural arbitration law. *Id.* at 939; *see, e.g.*, Gary B. Born, International Commercial Arbitration § 26.05[C][1][f][i][1] (3d ed. 2021) ("[T]he seat of the arbitration provides the procedural law of the arbitration and is, as a consequence, inextricably connected to the law governing the arbitration agreement ….").

This Court treats the primary jurisdiction's annulment decisions as conclusive, outside extreme circumstances. When a primary jurisdiction annuls a

_____

containing the general choice-of-law clauses and thus are not governed by such general choice-of-law clauses. Gary B. Born, International Commercial Arbitration § 26.05[C][1][f][i][1] (3d ed. 2021); *see* French Code Civ. Proc. art. 1447 (Westlaw) ("An arbitration agreement is independent of the contract to which it relates."); *see also* French Code Civ. Proc. art. 1506(1) (Westlaw).

foreign arbitral award, a U.S. court should defer to that annulment decision, and decline recognition here, unless the annulment decision is "repugnant to fundamental notions of what is decent and just in the United States." *TermoRio*, 487 F.3d at 939 (citation omitted); *see, e.g.*, *Esso Expl. & Prod. Nigeria Ltd. v. Nigerian Nat'l Petroleum Corp.*, 40 F.4th 56, 61 (2d Cir. 2022) (same); *see also Compañía de Inversiones Mercantiles S.A. v. Grupo Cementos de Chihuahua S.A.B. de C.V.*, 58 F.4th 429, 454 (10th Cir. 2023) (same). It would make no sense to hold that a primary jurisdiction's annulment decision is preclusive if it sets aside the award, but not if it confirms it. *See* Restatement (Third) U.S. Law of Int'l Comm. Arb. § 4.8(c) (2024) (when "deciding whether to grant post-award relief," a court "may decline to reexamine an issue decided in a judgment by a foreign court").

Indeed, there is a far stronger case for deferring to the primary jurisdiction's decisions *confirming* arbitral awards. The New York Convention was adopted to replace the Convention on the Execution of Foreign Arbitral Awards, Sept. 26, 1927, 92 L.N.T.S. 301 (the "Geneva Convention"), with a more pro-arbitration regime. "The primary defect of the Geneva Convention was that it required an award first to be recognized in the rendering state before it could be enforced abroad." *CBF Industría de Gusa S/A v. AMCI Holdings, Inc.*, 850 F.3d 58, 72-73 (2d Cir. 2017) (citation omitted). The New York Convention eliminated this "double exequatur" requirement and thus allows "concurrent enforcement and annulment actions, as

well as simultaneous enforcement actions in third countries." *Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 335 F.3d 357, 367 & n.41 (5th Cir. 2003). The singular importance of the "primary jurisdiction" in the New York Convention ultimately outweighs these pro-arbitration policies when the primary jurisdiction has annulled an award. But when, as here, the primary jurisdiction has rejected an arbitrability argument challenging the Tribunal's jurisdiction, the New York Convention's pro-arbitration and pro-primary jurisdiction policies align in favor of deferring to the primary jurisdiction's ruling.

Moreover, adopting the law of the primary jurisdiction under the FSIA arbitration exception aligns with other circuits' FAA jurisprudence on the merits. The New York Convention "contemplate[s] the use of domestic doctrines to fill gaps in the Convention" on merits issues, including the question of who is bound by arbitration agreements. *GE Energy Power Conversion France SAS, Corp. v. Outokumpu Stainless USA, LLC*, 590 U.S. 432, 440 (2020). The Second, Third, Fifth, Seventh, and Eleventh Circuits have all held "that the primary jurisdiction's domestic law acts as a gap-filler" and governs over other jurisdictions. *Corporación AIC, SA v. Hidroeléctrica Santa Rita S.A.*, 66 F.4th 876, 886 (11th Cir. 2023) (collecting cases).

The same rule should apply for the FSIA. The FSIA incorporates the same "background principles" of contract law as the FAA. *TIG*, 110 F.4th at 234

(quotation omitted). The FSIA and FAA should thus apply the same choice-of-law-rule. Any other rule could result incongruously in states being bound by the arbitration agreement for FSIA purposes but not on the merits, or vice versa.

Applying the law of the primary jurisdiction also beats any other alternative. There is no reason to apply the law of any other secondary jurisdiction.[5] The only alternative would be to apply substantive federal common-law contract principles (which, in any case, would establish that Guinea qualifies as a third-party beneficiary, *supra*, pp.23-24, 28-29). That is a bad solution. There are not enough "uniquely federal interests" that weigh in favor of such federal court innovation. *Rodriguez v. FDIC*, 589 U.S. 132, 136 (2020) (quotation omitted). As noted above, federal interests favor applying the law of the primary jurisdiction. The only conceivable reason to apply federal common law—the prospect of "developing a uniform body of law" to apply in all FSIA cases, *First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 622 n.11 (1983) (quotation omitted)—would be undermined by applying federal common-law principles. Developing a uniform body of federal common law on this subject is an enormous task. It is far easier to defer to the primary jurisdiction. If a foreign court in the primary jurisdiction has already ruled, the district court can follow its decision. If

---

[5] Again, Guinea is a secondary jurisdiction. *Supra*, pp.29 n.4. In any case, Guinean law does not diverge from French law on this issue. *Supra*, p.29.

the foreign court has not yet ruled, Article 6 of the New York Convention permits district courts to stay "confirmation proceedings" pending resolution of "an application to vacate the award" in the primary jurisdiction. *Stileks*, 985 F.3d at 879 (quotation omitted).

Last, other countries have treated a primary jurisdiction's rejection of a foreign state's arbitrability challenges to an arbitral tribunal's jurisdiction as issue preclusive. This is a relevant consideration because the Supreme Court has considered foreign state practice a relevant consideration when interpreting the New York Convention and the FSIA. *See, e.g.*, *GE Energy Power Conversion France*, 590 U.S. at 442 (New York Convention); *Permanent Mission of India to the United Nations v. City of New York*, 551 U.S. 193, 199-200 (2007) (FSIA). Just this year, the U.K. Court of Appeals held that a primary jurisdiction's rejection of Russia's arbitrability challenges was issue preclusive under the State Immunity Act of 1978. *See Hulley Enters. v Russian Fed'n* [2025] EWCA (Civ) 108 [3], [29]-[42], [53]-[71] (Eng.). Singapore follows the same rule. *See Republic of India v Deutsche Telekom AG*, [2023] SGCA(I) 10 ¶4.

Thus, the district court should have deferred to the Paris Court of Appeal's conclusion that Guinea was bound by, and thus "made," the Arbitration Agreement.

## B. The Tribunal Conclusively Found That Guinea Was Bound By The Agreement

Even if the French Judgment were not conclusive, this Court can and should hold that the Arbitral Tribunal's ruling that Guinea is bound by the Arbitration Agreement conclusively establishes that Guinea "made" the contract. The default rule "is that courts, not arbitrators, decide [such] questions of arbitrability"—that is, challenges to an arbitral tribunal's jurisdiction. *Stileks*, 985 F.3d at 878. But parties may contract around this default rule by "clearly and unmistakably" delegating arbitrability questions to the arbitrator. *Id.* (quotation omitted).

When parties delegate arbitrability to the tribunal, "'a court possesses no power to decide the arbitrability issue,' even if it thinks the argument for arbitrability is 'wholly groundless.'" *Id.* (citation omitted). The court must instead "respect the parties' decision" and defer to the arbitrator's ruling on arbitrability. *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 71 (2019).

The above line of precedent resolves this case. It is undisputed that the Arbitral Tribunal concluded that the Arbitration Agreement binds Guinea and rejected the same arbitrability challenges that Guinea raises here. J.A.__[ECF.4-1.at.27-29] (¶¶145-53). The district court's reasons for rejecting this straightforward application of FAA and FSIA jurisprudence were unpersuasive.

### 1. Guinea Clearly And Unmistakably Delegated Arbitrability To The Tribunal

The district court first wrongly ruled that Guinea had not delegated arbitrability to the Tribunal. J.A.__[ECF.44.at.27-28]. In fact, Guinea delegated arbitrability to the Tribunal both when it signed the Arbitration Agreement and after as it participated in the arbitration.

Guinea first delegated arbitrability to the Arbitral Tribunal by signing the Partnership Agreement and, through it, the Arbitration Agreement. J.A.__[ECF.4-6.at.11]. The Arbitration Agreement provides that all disputes arising out of the Partnership Agreement or any annexes and amendments be subject to "the exclusive jurisdiction of the Arbitration Rules of the International Chamber of Commerce [ICC] in Paris by one or more arbitrators appointed in accordance with these Rules." J.A.__[ECF.4-6.at.11]. "Article 6, section 3 of [the ICC's Rules] provides that claims 'concerning the existence, validity or scope of the arbitration agreement,' and 'any question of jurisdiction … shall be decided directly by the arbitral tribunal,' unless the Secretary General provides otherwise." *Olin Holdings Ltd. v. Libya*, 73 F.4th 92, 106 (2d Cir. 2023) (ellipsis omitted) (quoting ICC, Arbitration Rules, art. 6(3) (Jan. 1, 2012)). Article 6 further provides that, "the arbitral tribunal shall not cease to have jurisdiction by reason of any allegation that the contract is non-existent or null and void, provided that the arbitral tribunal upholds the validity of the arbitration agreement." ICC, Arbitration Rules, art. 6(9) (Jan. 1, 2012).

Every court of appeals to consider the issue has held that agreeing to arbitrate under ICC Rules, including Article 6, constitutes a clear and unmistakable delegation of "arbitrability, including challenges to the validity and enforceability of the agreement, to the Tribunal." *Olin Holdings*, 73 F.4th at 106; *see, e.g.*, *Portland Gen. Elec. Co. v. Liberty Mut. Ins. Co.*, 862 F.3d 981, 985-86 (9th Cir. 2017). Although this Court has not decided this specific question, it has similarly held that a similar United Nations Commission on International Trade Law ("UNCITRAL") Rule giving an arbitral tribunal the power to "rule on its own jurisdiction" constitutes a clear and unmistakable delegation of arbitrability to the arbitrator. *Stileks*, 985 F.3d at 878-79 (quotation omitted); *see, e.g.*, *Brittania-U Nigeria, Ltd. v. Chevron USA, Inc.*, 866 F.3d 709, 714 (5th Cir. 2017) (collecting cases). There is no basis for treating the ICC Rules as any less of a delegation. In both cases, the "arbitral rules … assign questions of arbitrability to the arbitrator." *Commc'ns Workers of Am. v. AT&T Inc.*, 6 F.4th 1344, 1347 (D.C. Cir. 2021).

The district court acknowledged that the incorporation of international arbitral rules can constitute clear and unmistakable evidence of delegation. J.A.__[ECF.44.at.27]. But the court found that Guinea had not agreed to incorporate the ICC Rules because it had not agreed to the Partnership Agreement. J.A.__[ECF.44.at.27]. In so doing, the court ruled that the Minister's signature on the contract had no legal significance. J.A.__[ECF.44.at.27]. As explained below,

that ruling was error. *Infra*, pp.43-52. And because Guinea signed the Arbitration Agreement, it agreed to delegate all "'gateway' questions of 'arbitrability,'" including "whether the parties have agreed to arbitrate." *Henry Schein*, 586 U.S. at 67-68 (citation omitted). It follows that the district court had "no authority to delve into the merits of [Guinea's] argument." *Stileks*, 985 F.3d at 879.

In any case, even if the district court were correct on this point, Guinea's later conduct throughout the arbitration amounted to a separate delegation of arbitrability to the Tribunal. A party can delegate arbitrability to the arbitrator if its conduct evinces "a clear willingness … to be effectively bound by the arbitrator's decision on that point." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 946 (1995); *see, e.g.*, *Beijing Shougang Mining Inv. Co. v. Mongolia*, 11 F.4th 144, 157-58 (2d Cir. 2021). Here, there are at least two ways in which Guinea's subsequent conduct constituted clear and unmistakable evidence of delegation.

*First*, Guinea signed the Terms of Reference for the arbitration—effectively a new contract delegating arbitrability. J.A.__[ECF.30-4.at.83-84]. Parties are not required by the ICC Rules to sign the Terms of Reference—the rules contemplate that parties may "refus[e] … to sign" them. ICC, Arbitration Rules, art. 23(3) (Jan. 1, 2012); *see, e.g.*, *Pott v. World Cap. Props. Ltd.*, No. 21-cv-23942, 2024 WL 2874858, at *6 (S.D. Fla. Mar. 19, 2024). But Guinea did sign. The Terms of Reference then provided that "[t]he applicable rules [for the arbitration] are the Rules

of Arbitration of the [ICC], in force as of January 1, 2012." J.A.__[ECF.30-4.at.35] (¶150). Again, these same ICC Rules delegate arbitrability to the Tribunal. *Supra*, pp.36-37. Signing the Terms of Reference thus constituted a clear and unmistakable delegation of arbitrability to the Tribunal. *See CBS Corp. v. WAK Orient Power & Light Ltd*., 168 F. Supp. 2d 403, 411-12 (E.D. Pa. 2001) (by signing the Terms of Reference and thus agreeing to the application of ICC Rules, defendant "knew and agreed that if it raised a question about the scope of the arbitration agreement the arbitral tribunal would determine if it had jurisdiction to answer it"); *cf. Schneider v. Kingdom of Thailand*, 688 F.3d 68, 72-73 (2d Cir. 2012) (incorporation in signed Terms of Reference of a similar UNCITRAL rule constituted clear and unmistakable evidence of delegation).

The district court had no answer to this argument. It acknowledged that Guinea had signed the Terms of Reference, but it missed that, when Guinea did sign the Terms, it agreed to comply with the ICC Rules. J.A.__[ECF.44.at.27-28].

*Second*, Guinea's remaining course of conduct in the arbitration evinced a desire to submit to arbitration. In the Terms of Reference, it stated that the Tribunal "must" resolve Guinea's jurisdictional objections, thus assigning arbitrability to the Tribunal. J.A.__[ECF.30-4.at.24] (¶114). It participated in an international arbitration proceeding in France, where the Code of Civil Procedure independently delegates arbitrability to the arbitrator. *See* French Code of Civ. Proc., art. 1465

(Westlaw) ("The arbitral tribunal has exclusive jurisdiction to rule on objections to its jurisdiction."); *id.*, art. 1506(3) (Westlaw).  Guinea demanded that the Tribunal reject Global Voice's claims on the merits, arguing (wrongly) that the relevant contracts were contrary to Guinean law and procured through corruption. J.A.__[ECF.30-4.at.26-29] (¶¶122-32).  Guinea and the PTRA also asked for the Tribunal to award damages over $100,000 for "moral damage" and "abuse of process."  J.A.__[ECF.30-4.at.33] (¶¶145-46).  The Ninth Circuit has held that a party who defends a case on the merits, in addition to objecting to the Tribunal's jurisdiction, "tacitly admit[s] that it was plausible for the arbitrator to assume jurisdiction over the dispute" and delegates arbitrability as a result. *Tristar Pictures, Inc. v. Dir.'s Guild of Am., Inc.*, 160 F.3d 537, 540 (9th Cir. 1998).

The district court disagreed, reasoning that in *First Options*, the Court held that "merely arguing the arbitrability issue to an arbitrator does not indicate a clear willingness to arbitrate that issue." J.A.__[ECF.44.at.28] (quoting 514 U.S. at 946). But this is nonresponsive.  The parties opposing confirmation in *First Options* not only failed to sign Terms of Reference that delegated arbitrability; they also failed to raise any merits arguments.  *See* 514 U.S. at 946 (parties filed just a "written memorandum objecting to the arbitrators' jurisdiction.").  By contrast, Guinea's merits arguments were three times as long as its jurisdictional objections. *Compare*

J.A.__[ECF.30-4.at.26-29, 31-32] (¶¶122-32, 139-41), *with* J.A.__[ECF.30-4.at.24-25] (¶¶114-17).

This case is far closer to the Second Circuit's decision in *Olin Holdings*. *Olin Holdings* held that Libya delegated arbitrability to the Tribunal because it signed a bilateral investment treaty in which it made a standing offer to arbitrate with investors under ICC Rules, participated in the "jurisdictional phase" of the arbitration without "object[ing] to the Tribunal's competence to decide the issues of arbitrability raised in its submissions," and then "argued its case in the 'merits phase.'" 73 F.4th at 106-07. *Olin Holdings* also distinguished *First Options* because the *First Options* respondents "participated in the arbitration only to object to the arbitrability of the dispute." *Id.* at 107. By contrast, when a respondent "participated in the entire proceeding and, in fact, independently urged the Tribunal to decide issues of arbitrability," it delegates arbitrability to the Tribunal. *Id.* So too here.

## 2. The Tribunal's Arbitrability Ruling Is Conclusive

That leaves only the district court's "open question" over whether a court "may ever defer to an arbitrator's determination that the foreign state was a party to the underlying arbitration agreement." J.A.__[ECF.44.at.23]. The district court did not decide the issue but expressed skepticism that such issues could be delegated because the existence of an arbitration agreement is a "jurisdictional fact" that must

exist for the court to maintain jurisdiction.  *See* J.A. __[ECF.44.at.21] (citation omitted).

This skepticism is misplaced.  Although subject-matter jurisdiction is always considered *de novo*, that does not mean that a district court can ignore a prior delegation.  Thus, in *Stileks*, this Court explained that although "legal issues relating to defenses under the New York Convention are reviewed *de novo*," that did not mean that courts were free to ignore delegation clauses.  985 F.3d at 879.  Instead, "the question that receives *de novo* review is whether the arbitrability decision was delegated to the arbitrators."  *Id.*  If so, that "is the only question that receives *de novo* review."  *Id.*  So too here.  The FSIA's arbitration exception incorporates the same "background principles" of contract law as the FAA.  *TIG*, 110 F.4th at 234 (quotation omitted).  The same FAA delegation rules should apply to the FSIA.  *See Hulley Enters. Ltd. v. Russian Fed'n*, No. 14-cv-1996, 2023 WL 8005099, at *16-18 (D.D.C. Nov. 17, 2023).

But even if this Court were to hold that FAA jurisprudence regarding delegation of arbitrability did not apply to the FSIA's arbitration exception, the Tribunal's ruling that Guinea was bound to arbitrate would be issue preclusive here.  Regardless of whether Guinea delegated arbitrability, it did fully and fairly litigate whether it was a party to, or otherwise bound by, the Arbitration Agreement during the arbitration.  The Tribunal's ruling was thus issue preclusive under federal

common law's three-part test, *see supra*, p.24. "[A] valid and final award by arbitration" generally "has the same effects under the rules of res judicata … as a judgment of a court." Restatement (Second) of Judgments § 84(1) (1982); *see, e.g.*, *Sanders v. Washington Metro. Area Transit Auth.*, 819 F.2d 1151, 1157 (D.C. Cir. 1987) ("When the parties have had a full and fair opportunity to present their evidence, the decisions of the arbitrator should be viewed as conclusive as to subsequent proceedings, absent some abuse of discretion by the arbitrator."); *OJSC Ukrnafta v. Carpatsky Petroleum Corp.*, 957 F.3d 487, 503 (5th Cir. 2020) ("[A]rbitral decisions may have [issue] preclusive effect as long as" they are grounded in "'basic elements of adjudicatory procedure.'") (citation omitted). Collateral attacks on a forum's jurisdictional rulings are likewise precluded. *See, e.g.*, *Durfee v. Duke*, 375 U.S. 106, 111-12, 115-16 (1963).

The Tribunal's holding that Guinea is a party and beneficiary of the Agreement is thus independently preclusive and establishes that Guinea "made" the Arbitration Agreement under the FSIA's arbitration exception.

## C. Even If Neither Decision Is Conclusive, The Arbitration Agreement Was Still "Made By" Guinea

Finally, even if this Court did not treat either the French Judgment or Arbitral Award as conclusive on this issue, it should still find that Guinea "made" the Arbitration Agreement under the FSIA based on the undisputed facts in the record. The district court disagreed because it believed that Guinea was not a "Party" to the

Arbitration Agreement.  This ruling was wrong, for two reasons.  *First*, Guinea was a party to the Arbitration Agreement.  *Second*, Guinea made the Arbitration Agreement even if it was not a party to it.

### 1.    Guinea Was A Party To The Arbitration Agreement

Global Voice's allegations and the exhibits appended to its pleadings established that Guinea was, in fact, a party to the Arbitration Agreement.  Guinea's Minister of Telecommunications and New Information Technologies signed and stamped the Agreement in his official capacity as Minister.  J.A.__[ECF.4-6.at.11, 22].  Simply providing a "contract with" a foreign state that "include[s] an agreement to arbitrate" is a "straightforward" way of establishing that the foreign state made an arbitration agreement.  *Process & Indus. Devs. Ltd. v. Fed. Republic of Nigeria*, 27 F.4th 771, 776 (D.C. Cir. 2022).  Producing this evidence of an agreement satisfied Global Voice's "prima facie showing that there was an arbitration agreement." *Chevron*, 795 F.3d at 205.

The district court speculated that the Minister had signed the Partnership Agreement only in an "oversight" capacity.  J.A.__[ECF.44.at.24] (quoting J.A.__[ECF.4-1.at.7] (¶7).  This ruling lacks any support in the record.  The passage from the Arbitral Award that the district court cites notes that the PTRA exists under the Ministry's "oversight."  But it does not suggest anywhere that the Minister signed the agreement only in a supervisory capacity.  J.A.__[ECF.4-1.at.7] (¶7).

The district court also faulted Global Voice for offering no other evidence "that the minister's signature represents agreement to and adoption of the contract by Guinea." J.A.__[ECF.44.at.24-25]. But Global Voice cannot be faulted for failing to rebut a finding the Tribunal never made. Plus, the French Judgment and Arbitral Award supply the necessary evidence. Guinea not only signed the Agreement, it also performed under the Agreement by issuing the May 2009 ministerial decree implementing the Agreement's terms and setting Global Voice's compensation at $0.07/minute. J.A.__[ECF.4-1.at.29] (¶149). Guinea also terminated the Agreement and tried to settle on behalf of the PTRA. J.A.__[ECF.4-5.at.8] (¶¶49-51); J.A.__[ECF.4-1.at.11-12] (¶¶38-45). That is why the Tribunal believed it "clear[] … that the State was a party to the Partnership Agreement and … considered itself … bound by its terms and by the Arbitration Agreement it contains." J.A.__[ECF.4-1.at.29] (¶152). But even if this evidence did not suffice, Global Voice still should have prevailed because the district court got the burden of persuasion backwards. Guinea bore "the burden of proving that [Global Voice's] allegations do not" satisfy "a statutory exception to immunity." *Belize Social Dev.*, 794 F.3d at 102 (quotation omitted). It thus bore the burden of showing that the Minister was providing only a routine sign-off, and Guinea failed to meet that burden.

The district court's other reason for finding that Guinea was not a "Party" to the Arbitration Agreement ignored D.C. Circuit precedent. It ruled that Guinea did not make the Arbitration Agreement because "Guinea is not defined as a 'Party' under the Partnership Agreement." *See* J.A.__[ECF 44.at.20-21, 24-26]. But "the agreement to arbitrate is 'separate from the obligations the parties owe to each other under the remainder of the contract,' and "is, for all intents and purposes, 'a distinct contract in and of itself.'" *Belize Soc. Dev.*, 794 F.3d at 102 (citation omitted). In *Belize Social Development*, for example, this Court held that even if Belize's Prime Minister lacked authority to enter into the underlying contract, there was no evidence that he lacked authority to agree to an arbitration clause in this contract. *Id.* at 102-03. It followed that Belize could not dispute that it had "made" the arbitration agreement. *Id.*

The fact that Guinea was not a defined party in the broader Partnership Agreement thus does not matter. What matters instead is the Arbitration Agreement, which does not define the "Parties" bound by it.[6] But the default rule is that a person who "sign[s] an arbitration agreement" has, in fact, agreed to arbitrate. *See Lamps Plus, Inc. v. Varela*, 587 U.S. 176, 179 (2019); *see, e.g.*, *First Options*, 514 U.S. at

---

[6] If the Court disagrees with this argument, however, the Paris Court of Appeals' and Tribunal's ruling that Guinea is bound by the Agreement would still be conclusive. *See supra*, Parts I.A-B.

941 ("MKI, having signed the only workout document (out of four) that contained an arbitration clause, accepted arbitration.").  Research reveals no cases, in state or federal court, in which (absent fraud, lack of capacity or authority, or similar doctrines that render its consent invalid) a signatory to a contract containing an arbitration clause was not considered bound by it.  And again, Guinea did not just sign the Arbitration Agreement.  It also benefitted from the Agreement under the Agreement's own terms, performed under the Agreement, and terminated the Agreement.  *Supra*, pp.23-24; *see, e.g.*, *Centex Corp. v. United States*, 52 Fed. Cl. 599, 603-06 (Fed. Cl. 2002) (ruling that a company was a "party" to a contract, even though it was not listed as a party in the contract, because one of the other parties "required the cooperation of" the company to implement the agreement).

To get around this precedent, the district court followed Guinea's argument that "the Arbitration Agreement applies, by its plain text, only to disputes between '*the Parties*,'" J.A.__[ECF.44.at.20-21], but that is both untrue and irrelevant.  It is untrue because the Arbitration Agreement says that any dispute "which may arise between" the Parties "shall be subject to" arbitration.  J.A.__[ECF 4-6.at.11].  It does not bar Global Voice and the PTRA from arbitrating claims against another Agreement signatory like Guinea.  Nor does it specify that that Global Voice and the PTRA are the only parties to the Arbitration Agreement.

The district court's ruling about the Arbitration Agreement's scope, even if credited, is also irrelevant. Whether the Arbitration Agreement applies to disputes involving Guinea bears on the Arbitration Agreement's *scope*, not who "made" it, 28 U.S.C. § 1605(a)(6). "[W]hich" parties and "which disputes are covered" by an arbitration clause, this Court recently held, bear on "the scope of the [] arbitration provision," not the arbitration provision's existence. *NextEra*, 112 F.4th at 1104. "It is well established in this Circuit that disputes about the scope of an arbitration agreement, such as whether a binding arbitration agreement covers a particular dispute, are not jurisdictional questions under the FSIA." *Id.* at 1101. "Scope questions" do not bear on jurisdiction, as the district court ruled, but "instead go to the award's enforceability on the merits." *Id.* "To make the issue jurisdictional, the sovereign must attack the existence or validity of the arbitration agreement." *Id.* And Guinea did not attack the Arbitration Agreement's existence or validity or deny that it helped "make" the Agreement. Neither did the district court.

The district court cited *NextEra* just before it ruled that sovereign immunity principles "require the Court to satisfy itself that [Guinea] agreed to arbitrate *the dispute*." J.A.__[ECF.44.at.22] (emphasis added). That is inconsistent with *NextEra*. There, the foreign state argued that, although it had made a standing offer to arbitrate *some* disputes with certain investors in a treaty, it did not agree to arbitrate the particular dispute with the particular investor. *See* 112 F.4th at 1102-

03. The fact that there was a dispute over whether the plaintiffs were "covered investors under the … ECT's arbitration provision" had no bearing on the "jurisdictional question under the FSIA." *Id.* at 1104; *see id.* ("It does not matter *why* the ECT may not apply to the dispute."). *NextEra* reflects a sensible effort by this Court to prevent foreign states from merging the merits with the FSIA. *Cf. Santos-Zacaria v. Garland*, 598 U.S. 411, 416 (2023) (because labeling a rule as jurisdictional is "harsh," federal courts should not treat a statutory rule as jurisdictional unless "Congress 'clearly states' that it is") (citations omitted). And the district court was required to follow *NextEra*.

In support of its "scope" ruling, the district court also cited the Supreme Court's observation in *First Options* that, under the FAA, "arbitration is simply a matter of contract." 514 U.S. at 943; *see* J.A.__[ECF.44.at.22]. But *First Options* has nothing to do with subject-matter jurisdiction or when an agreement is "made by" a foreign state under the FSIA's arbitration exception. Instead, consistent with *NextEra* and inconsistent with the district court's ruling, *First Options* effectively treated "arbitrability" as a "merits" question. *See* 514 U.S. at 949 (affirming lower court opinion that vacated confirmation of award on the merits). There is no basis to ignore *NextEra* based on a case predating it by 30 years and addressing a different issue.

## 2. Even If It Is Not A "Party" To The Arbitration Agreement, Guinea Still "Made" The Arbitration Agreement

Even if this Court were to credit the district court's ruling that Guinea is not a party to the Arbitration Agreement and signed it only in its "oversight" capacity, Guinea still would have "made" the Arbitration Agreement under 28 U.S.C. § 1605(a)(6), for two reasons.

*First*, as noted above, the Agreement was expressly intended to benefit Guinea, which establishes that Guinea qualifies as a third-party beneficiary, which satisfies the *TIG* test. *Supra*, pp.23-24, 28-29.

*Second*, crediting the district court's "oversight" assumption that the PTRA could not enter into the Arbitration Agreement itself without Guinea's written sign-off, Guinea "made" the Agreement just as much as the PTRA did. Regardless of whether Guinea is party to the Arbitration Agreement, it supplied the necessary consent for the Agreement to come into effect. That is why the Minister also signed the Amendment to the Partnership Agreement (which the Arbitration Agreement likewise covered). J.A.__[ECF.4-7.at.3]; *see* J.A.__[ECF.4-6.at.11] (noting that the arbitration provision would cover "any amendments" to the Partnership Agreement).

The district court, in assuming that only a contract party can "make" a contract, disregarded *TIG*'s acknowledgment that an agreement is "made," at minimum, by a state who "cause[s] [it] to exist." 110 F.4th at 232 (citation omitted). As a matter of plain English, Presidents "make" agreements with foreign countries

on behalf of the United States, even though the Presidents are not parties to those treaties. *See, e.g.*, The Daily, *How NAFTA Broke American Politics*, N.Y. Times (Oct. 8, 2024), https://tinyurl.com/yc74nat9 (President Reagan "had made an agreement with Canada that allowed for goods to be exported without tariffs or duties and goods to be imported without tariffs or duties."). CEOs likewise "make" agreements on behalf of their companies. *See, e.g.*, John Bonazzo, *This Week in Tech History: iTunes Store Opens, Chernobyl Nuclear Explosion*, Observer (Apr. 25, 2016), https://tinyurl.com/4m4h9m72 ("Steve Jobs made an agreement with five major record labels to offer their content through" iTunes."). So too with Section 1605(a)(6). Under *TIG*, the arbitration exception is not limited to cases where the foreign state is an original party to the agreement.

At minimum, when, as here, a foreign state provides the necessary permission for a political subdivision like the PTRA to sign an arbitration agreement, the foreign state has "made" the arbitration agreement itself. The FSIA "differentiate[s] an 'agency or instrumentality'" of a foreign state as "a separate legal person" that is distinct from the foreign state itself. *Wye Oak Tech., Inc. v. Republic of Iraq*, 666 F.3d 205, 214 (4th Cir. 2011) (quoting 28 U.S.C. § 1603(b)(1)). By contrast, "a political subdivision" under the FSIA generally "does not have separate legal personhood." *Id.* A political subdivision is instead considered "a part of the state itself." *See Transaero, Inc. v. La Fuerza Aerea Boliviana*, 30 F.3d 148, 153 (D.C.

Cir. 1994); *see, e.g.*, *Garb v. Republic of Poland*, 440 F.3d 579, 592 (2d Cir. 2006) (There is "no meaningful legal distinction between a sovereign and one of its political organs.") (citation and ellipsis omitted).[7] There is thus no basis to hold that Guinea is not bound by an arbitration agreement it signed as part of its oversight of the PTRA.

For all these reasons, the FSIA's arbitration exception applies.

## II. The District Court Had Subject-Matter Jurisdiction Under The FSIA's Waiver Exception

The FSIA's waiver exception, 28 U.S.C. § 1605(a)(1), provides an independent ground for the district court to exercise subject-matter jurisdiction. This exception grants federal courts jurisdiction over a civil action against a foreign sovereign that "has waived its immunity either explicitly or by implication." 28 U.S.C. § 1605(a)(1). As this Court explicitly held in *Tatneft* and recognized in *Creighton Ltd. v. Government of State of Qatar*, 181 F.3d 118, 123 (D.C. Cir. 1999), "a sovereign, by signing the New York Convention [and agreeing to arbitrate in a

---

[7]    There is no question that the PTRA qualifies as a "political subdivision," rather than an "agency or instrumentality," under the FSIA. *Compare* 28 U.S.C. § 1603(a), *with id.* § 1603(b).  An entity is a political subdivision if its "core functions … are predominantly governmental" and an agency or instrumentality if its core functions are "predominantly … commercial." *See Transaero*, 30 F.3d at 151.  The PTRA is an independent agency that "ensure[s] compliance by the telephone carriers with" the Guinean telecommunications law; it "issue[s] licenses and authorizations" to the same; and it "plan[s] and manage[s] frequencies." J.A.__[ECF.4-1.at.7] (¶7).  The PTRA is thus Guinea's version of the FCC, not a state-owned commercial enterprise.

country that has also ratified the New York Convention], waives its immunity from arbitration-enforcement actions in other signatory states." 771 F. App'x at 10. "[B]y the very provisions of the Convention, the signatory state must have contemplated enforcement actions in other signatory states," especially if it agrees to arbitrate in another signatory state. *Creighton*, 181 F.3d at 123 (quoting *Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co., Kommanditgesellschaft v. Navimpex Centrala Navala*, 989 F.2d 572, 578 (2d Cir. 1993)).

In fact, the waiver exception applies not just when a plaintiff sues a foreign state to enforce an arbitral award, but also when it sues to enforce a foreign judgment confirming the arbitral award, as Global Voice is doing here. *See Seetransport*, 989 F.2d at 581-83 (action to recognize Paris Court of Appeal judgment confirming arbitral award). Such a "cause of action" to recognize a foreign judgment confirming the arbitral award "is within the scope of the waiver because the cause of action is so closely related to the claim for enforcement of the arbitral award." *Id.* at 583; *cf. Amaplat Mauritius Ltd. v. Zimbabwe Mining Dev. Corp.*, 663 F. Supp. 3d 11, 36 (D.D.C. 2023) (it "makes sense" that "the waiver exception might capture a cause of action to enforce a foreign judgment, even if the arbitration exception does not").

The FSIA's waiver exception thus applies both to Global Voice's arbitration claim and its judgment-recognition claim. Guinea is not only a signatory to the New York Convention, it also signed an Arbitration Agreement that provided for

arbitration in France, another New York Convention signatory.  J.A.__[ECF.4.at.7] (¶27); J.A.__[ECF.4-6.at.11].  Thus, Guinea should have expected that any arbitral award that issued could be enforced in other New York Convention signatories. Also like in *Seetransport*, Guinea then affirmatively arbitrated the merits in France and sued to set aside the Arbitral Award in the Paris Court of Appeal, affirmatively submitting itself again to the primary jurisdiction.  J.A.__[ECF.4.at.4, 6] (¶¶13, 20-21).

There is no reason to create a circuit split on this issue.  A foreign state who agrees to litigate in the United States cannot act surprised if a judgment entered against her is enforced throughout the country under the Full Faith and Credit Clause and the Federal Registration Statute.  *See, e.g.*, *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 932 F.3d 126, 138 (3d Cir. 2019) (holding that, when a judgment has been obtained against a foreign state, the judgment may be registered and enforced in district courts around the country under 28 U.S.C. § 1963 without satisfying the FSIA's jurisdictional requirements).  Indeed, "[o]nce it has been determined by a court of competent jurisdiction that the defendant is a debtor of the plaintiff," a court may hear an action to collect the judgment wherever "the defendant has property, whether or not that State would have jurisdiction to determine the existence of the debt as an original matter."  *Shaffer v. Heitner*, 433 U.S. 186, 210 n.36 (1977).  So too when, as here, a party to the New York

Convention agrees to arbitrate in another signatory state whose judgments are recognized around the world, moves to set aside the arbitral award there, and loses. *Cf. Lenchyshyn v. Pelko Elec., Inc.*, 281 A.D.2d 42, 49 (N.Y. App. Div. 2001) (a party suing under the New York Recognition Act "does not seek any new relief against the judgment debtor, but instead merely asks the court to perform its ministerial function of recognizing the foreign country money judgment and converting it into a New York judgment.").

In ruling that the waiver exception did not apply, the district court noted that this Court has "declined to 'formally' adopt" *Seetransport* in a precedential opinion. J.A.__[ECF.44.at.29]. But this Court has endorsed *Seetransport* twice and never rejected it. Even the recent cases that have stopped short of endorsing *Seetransport* again have done so only as to claims to confirm *arbitral awards* (based largely on a *lex specialis* concern that the waiver exception should govern such claims), not claims to confirm foreign judgments that, themselves, confirmed foreign arbitral awards. *See Process & Indus. Devs.*, 27 F.4th at 775 n.3. Global Voice should be able to bring both its FAA and Recognition Act claims under *Seetransport*, but, at minimum, the *lex specialis* objection does not apply to the Recognition Act claim.

The district court also ruled that the waiver exception could not apply unless it was clear that the foreign state agreed "to arbitrate that particular dispute." J.A.__[ECF.44.at.30]. But Guinea agreed to the Arbitration Agreement because it

signed the Agreement.  *Supra*, pp.44-52.  Any objections to the Arbitration Agreement's scope are not jurisdictional.  *See, e.g.*, *NextEra*, 112 F.4th at 1101.

In any case, the district court ignored that Guinea did not merely sign Arbitration Agreement, but it also (1) signed the New York Convention; (2) signed the Terms of Reference; (3) asked the Arbitral Tribunal to resolve its jurisdictional arguments; (4) litigated the merits; and (5) then brought its own action to set aside the Arbitral Award in France.  *Supra*, pp.39, 44-48, 54.  Guinea cannot repeatedly litigate arbitrability in jurisdictions whose judgments U.S. courts enforce (like the ICC and France) and feign surprise if, after Guinea loses, a U.S. court exercises jurisdiction over enforcement proceedings.  Affirming would allow a foreign state to play "heads-I-win, tails-you-lose" in the arbitration and primary jurisdiction, giving it the option of enforcing a favorable decision if it wins while ignoring any losses.  That would undermine the New York Convention's entire scheme, which promotes arbitration and the primacy of the arbitral seat.  *Supra*, pp.29-34.

The FSIA's waiver exception thus applies.

## CONCLUSION

The Court should reverse the district court's decision dismissing Global Voice's FAA and Recognition Act claims for lack of subject-matter jurisdiction.

DATED:   June 17, 2025                    Respectfully submitted,

                                          */s/ Alex H. Loomis*

Dennis H. Hranitzky                       Alex H. Loomis
QUINN EMANUEL URQUHART                     QUINN EMANUEL URQUHART
   & SULLIVAN, LLP                            & SULLIVAN, LLP
2755 East Cottonwood Parkway,             111 Huntington Avenue,
Suite 430                                 Suite 520
Salt Lake City, UT 84121                  Boston, MA 02199
(801) 515-7300                            (617) 712-7100
dennishranitzky@quinnemanuel.com          alexloomis@quinnemanuel.com

                                          Owen B. Smitherman
                                          QUINN EMANUEL URQUHART
                                             & SULLIVAN, LLP
                                          300 W. 6th Street,
                                          Suite 2010
                                          Austin, TX 78701
                                          (737) 667-6100
                                          owensmitherman@quinnemanuel.com

                                          *Counsel for Petitioner-Appellant Global*
                                             *Voice Group SA*

# CERTIFICATE OF COMPLIANCE

1.  This document complies with the type-volume limits of Fed. R. App. P. 28.1(e)(2)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 12,906 words.

2.  This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Times New Roman.


DATED:  June 17, 2025                    /s/ *Alex H. Loomis*
                                         Alex H. Loomis

**ADDENDUM**

## ADDENDUM TABLE OF CONTENTS

Foreign Sovereign Immunities Act

28 U.S.C. § 1605(a)(1) & (a)(6)…..…………………………………...Add. 1

Federal Arbitration Act

9 U.S.C. § 207………………….……………………………………...Add. 2

# 28 U.S.C. § 1605

## § 1605.  General exceptions to the jurisdictional immunity of a foreign state

(a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case—

> (1) in which the foreign state has waived its immunity either explicitly or by implication, notwithstanding any withdrawal of the waiver which the foreign state may purport to effect except in accordance with the terms of the waiver;
> …
> (6) in which the action is brought, either to enforce an agreement made by the foreign state with or for the benefit of a private party to submit to arbitration … or to confirm an award made pursuant to such an agreement to arbitrate, if … the agreement or award is or may be governed by a treaty or other international agreement in force for the United States calling for the recognition and enforcement of arbitral awards, ….

## § 207.  Award of arbitrators; confirmation; jurisdiction; proceeding

Within three years after an arbitral award falling under the Convention is made, any party to the arbitration may apply to any court having jurisdiction under this chapter for an order confirming the award as against any other party to the arbitration. The court shall confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention.

## CERTIFICATE OF SERVICE

I certify that on June 17, 2025, the foregoing brief was electronically filed through this Court's CM/ECF system, which will send a notice of filing to all registered users.

/s/ *Alex H. Loomis*
Alex H. Loomis